XAVIER BECERRA
Attorney General of California
JAY M. GOLDMAN
Supervising Deputy Attorney General
MICHAEL J. QUINN
Deputy Attorney General
State Bar No. 209542
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3611
  Fax:  (415) 703-5843
  E-mail:  Michael.Quinn@doj.ca.gov
*Attorneys for Defendants Risenhoover and Adam*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| **TAIRAY TAQWAIN MORRIS,**<br><br>Plaintiff,<br><br>v.<br><br>**STATE OF CALIFORNIA, ET AL.,**<br><br>Defendants. | 4:19-cv-02620-HSG (PR)<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

**Page**

TO PLAINTIFF TAIRAY TAQWAIN MORRIS, PRO SE: ............................................................ 1

Memorandum of Points and Authorities ..................................................................................... 1

Introduction ................................................................................................................................. 1

Statement of the Issues ............................................................................................................... 2

Statement of Facts ....................................................................................................................... 2

     I.       The Initial Complaint and Defendants' Motion to Dismiss. ................................... 2

     II.     The Amended Complaint. ....................................................................................... 3

     III.    The Treatment of Morris by Defendant Risenhoover and Other Medical
            Staff Between October 2015 and October 2016. ................................................... 3

     IV.    The Treatment of Morris by Defendant Adam and Other Medical Staff
            Between February 2017 and November 2018. ....................................................... 5

Standard of Review ..................................................................................................................... 8

Argument ..................................................................................................................................... 9

     I.       Defendants Did Not Act With Deliberate Indifference to Morris's Serious
            Medical Needs. ...................................................................................................... 9

          A.     Defendant Risenhoover Was Not Deliberately Indifferent to
                 Morris's Alleged Medical Needs. .............................................................. 10

          B.     Defendant Adam Was Not Deliberately Indifferent to Morris's
                 Alleged Medical Needs. ............................................................................ 11

     II.     Morris Lacks Evidence to Support Claims for Punitive Damages. ...................... 13

     III.    Defendants Are Entitled to Qualified Immunity. ................................................. 13

          A.     The Qualified Immunity Standard. ........................................................... 13

          B.     Defendants Are Entitled to Qualified Immunity Because They Did
                 Not Violate Morris's Eighth Amendment Rights. .................................... 14

          C.     Defendants Are Also Entitled to Qualified Immunity Because It
                 Would Not Have Been Clear to a Reasonable Prison Official That
                 Their Conduct Was Unlawful. .................................................................. 14

Conclusion ................................................................................................................................. 15

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242 (1986)................................................................................................8, 9

*Burns v. Reed*
500 U.S. 478 (1991)...................................................................................................13

*Celotex Corp. v. Catrett*
477 U.S. 317 (1986).....................................................................................................8

*Estelle v. Gamble*
429 U.S. 97 (1976).......................................................................................................9

*Farmer v. Brennan*
511 U.S. 825 (1994).....................................................................................................9

*Harlow v. Fitzgerald*
457 U.S. 800 (1982)...................................................................................................13

*Hope v. Pelzer*
536 U.S. 730 (2002)...................................................................................................14

*Hutchinson v. United States*
838 F.2d 390 (9th Cir. 1988).....................................................................................10

*Jeffers v. Gomez*
267 F.3d 895 (9th Cir. 2001).....................................................................................14

*Jett v. Penner*
439 F.3d 1091 (9th Cir. 2006).....................................................................................9

*McGuckin v. Smith*
974 F.2d 1050 (9th Cir. 1992)................................................................................9, 10

*Pearson v. Callahan*
555 U.S. 223 (2009)..............................................................................................13, 14

*Ruffin v. Cty. of Los Angeles*
607 F.2d 1276 (9th Cir. 1979).....................................................................................8

*Saucier v. Katz*
533 U.S. 194 (2001)........................................................................................13, 14, 15

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3   *Smith v. Wade*

4       461 U.S. 30 (1983) ......................................................................................................13

5   *Steckl v. Motorola, Inc.*
        703 F.2d 392 (9th Cir. 1983) ........................................................................................8

6
    *Toguchi v. Chung*

7       391 F.3d 1051 (9th Cir. 2004) ................................................................................9, 10

8   **STATUTES**

9   United States Code, Title 28

10      § 1915A ..........................................................................................................................3

11  **CONSTITUTIONAL PROVISIONS**

12  United States Constitution
        Eighth Amendment ................................................................................................ *passim*

13  **COURT RULES**

14
    Federal Rules of Civil Procedure

15      Rule 56 ...........................................................................................................................1

16      Rule 56(a) .......................................................................................................................8

17

18

19

20

21

22

23

24

25

26

27

28

Defs.' Not. Mot. & Mot. Summ. J. (4:19-cv-02620-HSG (PR) )

**TO PLAINTIFF TAIRAY TAQWAIN MORRIS, PRO SE:**

**PLEASE TAKE NOTICE THAT** Defendants Risenhoover and Adam move for summary judgment under Federal Rule of Civil Procedure 56 on Plaintiff's Eighth Amendment claim on the grounds that there is no genuine issue as to any material fact, that they are entitled to judgment as a matter of law, and that they are also entitled to qualified immunity.  In addition, Defendants also move for summary judgment against Plaintiff's claim for punitive damages.

This motion is based upon this notice of motion and motion, the memorandum of points and authorities, the supporting declaration of Defendant Adam, the *Rand* notice, this Court's file, and any matters properly before this Court.

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

In this case, Pelican Bay State Prison (Pelican Bay) inmate Morris claims that despite making several requests to Defendant Dr. Risenhoover from October 16, 2015 to October 22, 2016, he did not receive any treatment for the swelling in his right leg during that period.  Moreover, despite submitting numerous sick call complaints from May 8, 2017 to November 26, 2018, he was not seen or treated by Defendant Dr. Adam regarding his knee osteoarthritis.

Morris's contentions are utterly meritless.  The evidence establishes that while Morris did not complain any right leg issues to Defendant Risenhoover between October 16, 2015 and October 22, 2016, she provided extensive medical care to Morris in connection with his hypertension, seizure disorder, foot problems, and neck rash during that period.  In addition, contrary to Morris's claims, Defendant Adam treated his moderate osteoarthritis between May 2017 and November 2018.  As explained more fully below, Defendants and medical staff consistently attempted to provide appropriate care for Morris's medical issues during the periods in question.

Because there is no evidence that Defendants were deliberately indifferent to Morris's medical needs, they are entitled to summary judgment on the Eighth Amendment claims in this case.  In addition, summary judgment should be granted against Morris's claim for punitive damages because the undisputed material facts based on the evidence show that Morris cannot

1

1   prove the elements of such a claim for damages.

2       Alternatively, even if this Court were to find that Morris's constitutional rights were

3   infringed upon, which is not the case, Defendants are still entitled to qualified immunity because

4   it would not have been clear to reasonable prison officials under the circumstances encountered

5   by Defendants that their alleged conduct violated clearly established law.

6                           **STATEMENT OF THE ISSUES**

7       1.   To establish deliberate indifference, Morris must show that Defendants knew he had a

8   serious medical need, and caused him harm by failing to respond to that need.  In this case, there

9   is no evidence that Defendants failed to address his osteoarthritis or any of his other medical

10  conditions.  To the contrary, Defendant Risenhoover provided care for all conditions raised or

11  identified; Morris's hypertension, seizure disorder, foot problems, and a neck rash during 2015

12  and 2016.  Defendant Adam treated his osteoarthritis throughout 2017 and 2018.  Are Defendants

13  entitled to summary judgment because there was no triable issue as to whether they were

14  deliberately indifferent to his medical needs?

15      2.   The undisputed material facts show that Defendants each lacked the evil motive or

16  intent, or reckless or callous indifference to the rights of others, required for Morris to maintain a

17  claim for punitive damages.  Is each Defendant entitled to summary judgment on this claim?

18      3.   A prison official is entitled to qualified immunity if he does not violate clearly

19  established law, or if it would not have been clear to a reasonable official under the circumstances

20  that the Defendants' conduct was unlawful.  In this case, Morris's Eighth Amendment rights were

21  not violated, and a reasonable prison official would not have believed that Defendants' conduct

22  was unlawful.  Is each Defendant entitled to qualified immunity?

23                           **STATEMENT OF FACTS**

24  **I.   THE INITIAL COMPLAINT AND DEFENDANTS' MOTION TO DISMISS.**

25      Morris, a state-prison inmate housed at Pelican Bay, filed suit claiming that his rights under

26  the ADA were violated.  (ECF No. 16, 2:27-4:10.)  He alleged that Defendants violated his rights

27  under the ADA by "discriminating against him by reason of his physical disabilities."  (ECF No.

28  1, p. 11.)  He asserted that he had been diagnosed with a right-knee meniscus tear, knee

                                            2

1    osteoarthritis, and foot ulcers.  (*Id.*)  Morris contended that he requested to be transferred to a

2    prison where he can have "constant access" to an on-site orthopedist and podiatrist, use of a

3    wheelchair, and access to a wheelchair ramp.  (ECF No. 1, p. 12.)

4        This Court screened his complaint under 28 U.S.C. § 1915A, and found that Morris stated

5    cognizable claims under the ADA.  (ECF No. 16, 9:23-27.)  The Court ordered service on

6    Defendants Warden Robertson (in his official capacity), CDCR Secretary Diaz (in his official

7    capacity), the State of California, the CDCR, and the CCHCS.  (*Id.* at 10:23-28.)  Further, the

8    Court ordered Defendants to file a dispositive motion on or before February 25, 2020, if

9    warranted.  (ECF No. 16, 11:1-10.)

10        Defendants filed a motion to dismiss the complaint on February 4, 2020.  (ECF No. 24.)  In

11   an April 30, 2020 Order, this Court granted the motion after concluding that Morris's requests

12   concerned treatment for his medical conditions, and not services, programs, or activities covered

13   by the ADA.  (ECF No. 31, 6:8-11.)

14   **II.    THE AMENDED COMPLAINT.**

15        While the motion to dismiss was pending, Morris requested that the Court allow him to file

16   an amended complaint.  (ECF No. 29.)  In the April 30, 2020 Order, this Court concluded that

17   "the amended complaint's allegations that (1) despite making several requests to defendant

18   Risenhoover from October 16, 2015 to October 22, 2016, plaintiff did not receive any treatment

19   for the swelling in his right leg, and (2) despite submitting numerous sick call complaints from

20   May 8, 2017 to November 26, 2018, plaintiff was not seen or treated by defendant Adams

21   regarding his knee osteoarthritis state[d] cognizable claims Eighth Amendment claims against

22   defendants Risenhoover and Adams in their individual capacities."  (ECF No. 31, 9:24-10:1.)

23   **III.   THE TREATMENT OF MORRIS BY DEFENDANT RISENHOOVER AND OTHER MEDICAL**
24   **STAFF BETWEEN OCTOBER 2015 AND OCTOBER 2016.**

25        Morris received extensive medical attention between October 2015 and October 2016, but it

26   does not appear that he complained of any right leg issues to Risenhoover during that period.

27   (Adam Declaration, ¶3.)  On October 1, 2015, Risenhoover sent Morris a notification letter

28   regarding recent lab results, and indicated that the results would be discussed with him at his next

3

1   regularly scheduled chronic care visit. (*Id*. at ¶4.) On October 5, 2015, Risenhoover reviewed

2   Morris's medications and adjusted his hypertension and seizure medications. (*Id*.) He was seen

3   by a nurse for "cold symptoms" on October 13, 2015, and was then seen by Risenhoover on

4   October 16, 2015 for chronic care of his seizure disorder and hypertension. (*Id*.) During the

5   October 16 appointment, Morris reported that he exercised "five days per week," which included

6   three or four laps in the yard and 1,000 pushups each day. (*Id*.) Morris further stated that he did

7   not know why he had a notice regarding his mobility in his file because he felt "fine." (*Id*.) That

8   special notice, a CDCR-7410 form requiring that he be housed in a low bunk and low tier, was

9   related to his seizure disorder and the consequent danger of falls. (*Id*.)

10      During the final months of 2015, he complained of foot problems. (*Id*. at ¶5.) On

11   November 24, 2015, he was seen by a nurse and requested "some kind of cream to make the

12   calluses between [his] toes go away." (*Id*.) The nurse found that he had dry, cracked skin

13   between his toes, and was given instructions to keep his feet clean and dry. (*Id*.)

14      On December 22, 2015, he was again seen by a nurse after complaining that his right foot

15   was swollen. (*Id*. at ¶6.) Because he refused to walk to the clinic, he was examined, with his

16   permission, in the rotunda of the housing unit. (*Id*.) He reported that his foot was swollen and

17   painful but that he was continuing his exercise routine. (*Id*.) Morris refused antifungal cream,

18   and was observed walking back to his cell with a normal gait. (*Id*.) Defendant Risenhoover was

19   consulted and stated that a blood test Morris had requested was not required. (*Id*.) He received

20   routine blood tests regularly due to his other diagnoses. (*Id*.)

21      Morris interacted with medical staff throughout March 2016. (*Id*. at ¶8.) On March 1,

22   2016, he was seen for chronic care hypertension and a seizure disorder. (*Id*.) He again stated that

23   he exercised five days per week, but had quit doing burpees (a very high impact exercise popular

24   in prison). (*Id*.) The notes from that visit did not refer to any leg swelling. (*Id*.) On March 9,

25   2016, Morris complained that he had "a rash now on both sides of [his] neck." (*Id*.) He also

26   stated that the hydrocortisone cream that he had been given did not work. (*Id*.) He was seen by

27   Risenhoover on March 15, 2016 for the rash on his neck, and was diagnosed with contact

28   dermatitis. (*Id*.) He was told to rinse off the soap when he washed, and to avoid scratching the

4

area.  (*Id.*)  On March 23, 2016, he was seen by a nurse for the ongoing neck rash.  (*Id.* at ¶9.)

The following day, March 24, 2016, he had an annual EKG screening, which was normal.  (*Id.*)

He also had labs drawn for cholesterol and thyroid, which were reported to be normal several

days later.  (*Id.*)

In April 2016, Morris had labs drawn for a comprehensive metabolic panel and urinalysis.

(*Id.* at ¶10.)  On April 15, 2016, he was notified that those labs were normal.  (*Id.*)  On April 20,

2016, he was also seen by a nurse and obtained another bottle of ointment for the rash on his

neck.  (*Id.*)

Morris was seen again by medical staff in August 2016, when labs were drawn for his

carbamazepine level, a complete blood count, and urinalysis.  (*Id.* at ¶11.)  Morris was informed

that the labs were normal on August 22, 2016.  (*Id.*)  On August 25, 2016, Morris was seen by

Risenhoover for his chronic care hypertension and seizure disorder.  (*Id.* at ¶12.)  Morris reported

that he was still engaging in the same exercise routine, but was avoiding burpees.  (*Id.*)  The

report indicated that he had good muscle development.  (*Id.*)

On September 1, 2016, labs were drawn for his complete blood count and carbamazepine

level.  (*Id.* at ¶13.)  He was notified of the normal lab results the following day.  (*Id.*)  On October

23, 2016, Morris submitted a request for care which stated that his knee was swelling when he

ran.  (*Id.* at ¶14.)  He was seen by a nurse the following day.  (*Id.*)  The notes from that

appointment indicate that he had good musculature in both legs, had full motion of the knee, but

did have some mild swelling present in his right knee.  (*Id.*)  Morris stated he had no pain, and

was returned to his housing with no new orders.  (*Id.*)

## IV.   THE TREATMENT OF MORRIS BY DEFENDANT ADAM AND OTHER MEDICAL STAFF BETWEEN FEBRUARY 2017 AND NOVEMBER 2018.

Morris was seen by a nurse on February 8, 2017 for right knee pain, and a follow up visit

with Defendant Adam was scheduled.  (*Id.* at ¶15.)  The visit with Adam for his knee occurred on

February 14, 2017; during that appointment, he also received routine care for his hypertension

and seizure disorder.  (*Id.*)  Morris explained that he felt his knee had been injured two years

before during a fight, and had been exacerbated by playing basketball.  (*Id.*)  His right knee exam

5

on that day was normal.  (*Id.*)  He was given education on avoiding high impact exercise,

elevating the leg if swollen, and taking an occasional non-steroidal anti-inflammatory (NSAID),

such as ibuprofen, if the knee was painful.  (*Id.*)  Adam asked him to put in another sick call

request if he felt he was no better in two months—at that time, physical therapy could be

considered.  (*Id.*)  During his chronic care visit, he again related that he was exercising

vigorously—five days per week for about 90 minutes per session, which included 20 laps around

the yard over 30 minutes.  (*Id.*)

On March 16, 2017, Morris was seen by a nurse for a complaint of knee swelling, and he

stated he was following Defendant Adam's instructions from his last visit.  (*Id.* at ¶16.)

Defendant Adam asked the nurse to tell him to continue the plan for another month, as previously

instructed.  (*Id.*)  In April 2017, Morris was seen by a nurse—once for a cold and a second time

for his knee.  (*Id.*)  The nurse reported a near normal exam of the knee, as Morris was able to do

deep knee bends, though he used the edge of table to rise back up to a standing posture.  (*Id.*)  At

that time, a follow-up appointment was scheduled with Defendant Adam, who examined Morris

on May 1, 2017. (*Id.*)  When he complained again of intermittent swelling of his right knee with

associated pain, Adam ordered an x-ray of his knee.  (*Id.*)

The x-ray of Morris's knee was performed on May 4, 2017, and showed a small effusion,

and moderate patellofemoral and medial compartment osteoarthritis.  (*Id.*)  The effusion indicated

that he had mild swelling and inflammation of the knee.  (*Id.*)  Osteoarthritis is the common type

of "wear and tear" joint damage that occurs with age, and overuse or misuse would not be an

uncommon finding in a 40-year-old male such as Morris, who had engaged in years of repetitive

high impact exercise during incarceration.  (*Id.*)  A letter was written to Morris to inform him of

the results of the x-ray, and a follow up appointment with Defendant Adam was scheduled for

him.  (*Id.*)

Of note, moderate osteoarthritis is usually treated conservatively with appropriate exercise

(decrease in high impact while maintaining strength), weight loss, and possibly NSAID's.  (*Id.* at

¶17.)  The extent of intervention is based on the patient's disability, and Morris at that time stated

that he maintained a vigorous exercise routine, including running, which indicated a high level of

6

1    functioning.  (*Id.*)

2          On May 22, 2017, Morris was seen by a nurse concerning the x-ray results and complaints

3    of knee pain and intermittent swelling.  (*Id.* at ¶19.)  The nurse explained to Morris that he had

4    arthritis and educated him regarding that condition.  (*Id.*)  The nurse noted swelling on the medial

5    side of the knee, but there was no clicking or popping in the knee.  (*Id.*)  Morris also had good

6    muscle strength in his legs, was not limping, had no problem getting on and off the exam table,

7    and was able to do deep knee bends.  (*Id.*)

8          On June 6, 2017, Defendant Adam met with Morris to review the condition of his knee and

9    the x-ray results.  (*Id.* at ¶20.)  Morris had previously declined physical therapy, and Adam

10   informed him that a MRI was not required.  (*Id.*)  Although his knee had mild crepitus, a typical

11   symptom of osteoarthritis, he had full motion, and the knee did not have any redness or swelling.

12   (*Id.*)  Adam recommended that he engage in healthy knee exercises, and educated him regarding

13   care when the knee was swollen.  (*Id.*)

14         Defendant Adam saw Morris on August 7, 2017, November 1, 2017 and February 1, 2018

15   for routine care of his hypertension and seizure disorder.  (*Id.* at ¶22.)  During those interactions,

16   Morris reported that he was continuing to engage in frequent vigorous exercise, three to five

17   times per week, with ongoing avoidance of high impact burpees.  (*Id.*)

18         On April 16, 2018, Morris was seen by a nurse after complaining of an ongoing rash on his

19   neck.  (*Id.* at ¶23.)  He requested an ointment refill, but such a refill had already been requested

20   from the pharmacy.  (*Id.*)  On April 26, 2018, Defendant Adam followed up with Morris

21   regarding the hypertension medicine changes and his rash.  (*Id.* at ¶24.)  He stated that his blood

22   pressure was high that morning because he had just finished exercising.  (*Id.*)

23         On July 11, 2018, Morris was notified of lab results showing that he had high cholesterol,

24   and was counseled regarding lifestyle changes.  (*Id.* at ¶26.)  He was seen for chronic care

25   hypertension and seizure disorder on July 24, 2018.  (*Id.*)  During that appointment, he stated that

26   he was exercising three to four times per week, for two hours per session.  (*Id.*)  An EKG was

27   also done on July 24, and medications were adjusted.  (*Id.*)

28

1   On August 1, 2018, Morris was seen by a nurse for pain in his pubic bone, which had

2   recently occurred when he ran and did squats.  (*Id*. at ¶27.)  He told the nurse that the discomfort

3   began after he started doing a new Navy seal workout.  (*Id*.)

4   On November 21, 2018, Morris was seen by a nurse because he was noted to have elevated

5   blood pressure during a routine blood pressure check.  (*Id*. at ¶28.)  On November 26, 2018,

6   Morris was seen by a nurse after complaining of toe pain from a "cut on toe" that hurt every time

7   he showered.  (*Id*.)  In addition, he made a separate request for care due to knee pain.  (*Id*.)  The

8   nurse was very concerned about the condition of his toes and ordered an urgent follow up by a

9   primary care physician.  (*Id*.)  Defendant Adam saw him the next day, on November 27, 2018,

10   and examined an open wound on his foot.  (*Id*. at ¶29.)  He had deep ulcers in that area and was

11   referred to general surgery for debridement.  (*Id*.)  Adam also ordered further follow-up of his

12   knee pain and anterior hip pain.  (*Id*.)  Morris told Adam at that time that he had cut back on his

13   running during the previous year, but his knee pain had returned two months earlier after running

14   10 laps in "too flat" shoes.  (*Id*.)

15   Overall, between May 2017 and November 2018, Morris had moderate osteoarthritis, but

16   because he was very active and was able to engage in normal daily activities, neither surgery nor

17   a pre-surgical MRI was medically required during that time.  (*Id*. at ¶30.)

18   **STANDARD OF REVIEW**

19   Summary judgment is appropriate where "there is no genuine dispute as to any material fact

20   and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Material facts

21   are those that may affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242,

22   248 (1986).  The party moving for summary judgment bears the initial burden of identifying those

23   portions of the pleadings, discovery, and affidavits demonstrating the absence of a genuine issue

24   of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

25   Once the moving party meets its initial burden, summary judgment is mandated where the

26   nonmoving party fails to "set forth specific facts showing that there remains a genuine issue for

27   trial" and evidence "significantly probative as to any [material] fact claimed to be disputed."

28   *Steckl v. Motorola, Inc*., 703 F.2d 392, 393 (9th Cir. 1983), citing *Ruffin v. Cty. of Los Angeles*,

8

607 F.2d 1276, 1280 (9th Cir. 1979).  If the evidence presented by the nonmoving party is "merely colorable, or is not sufficiently probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50.  There is no triable issue of fact unless the nonmoving party submits sufficient evidence for a jury to return a verdict in the nonmoving party's favor.  *Id.*

## ARGUMENT

### I.   DEFENDANTS DID NOT ACT WITH DELIBERATE INDIFFERENCE TO MORRIS'S SERIOUS MEDICAL NEEDS.

In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner-plaintiff must prove "deliberate indifference to serious medical needs."  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  The Ninth Circuit has established a two-part test in order to analyze whether a defendant has been deliberately indifferent to a plaintiff's serious medical needs.  *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992) *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc).

The plaintiff must first show an objectively "serious medical need" by demonstrating that the "failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'"  *Id.* at 1059 (citing *Estelle*, 429 U.S. at 104).  If the plaintiff satisfies that first step, he must then demonstrate that the defendant acted with deliberate indifference, which is a subjectively "sufficiently culpable state of mind" that is more than mere negligence but less than conduct undertaken for the very purpose of causing harm.  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  This second prong is satisfied by showing: (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need; and (b) harm caused by the indifference.  *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).  Indeed, a prison official is only liable under the Eighth Amendment if the official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847.  Allegations of negligence, gross negligence, civil recklessness, and medical malpractice are all insufficient to establish a constitutional violation.  *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004); *Farmer*, 511 U.S. at 836.  Indifference "may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown

9

by the way in which prison physicians provide medical care." *McGuckin*, 974 F.2d at 1059

(quoting *Hutchinson v. United States*, 838 F.2d 390, 392 (9th Cir. 1988)). But "[d]eliberate

indifference is a high legal standard." *Toguchi,* 391 F.3d at 1060.

In this case, while the swelling in Morris's right leg and his knee osteoarthritis constitute

serious medical issues, Defendants were not deliberately indifferent to his needs. Accordingly, as

explained more fully below, Defendants are entitled to summary judgment on Morris's claim for

deliberate indifference to serious medical needs in violation of the Eighth Amendment.

> **A.     Defendant Risenhoover Was Not Deliberately Indifferent to Morris's Alleged Medical Needs.**

The evidence establishes that Morris's medical needs were not ignored by Defendants

Risenhoover and Adam during the relevant periods. With regard to Defendant Risenhoover,

Morris received extensive medical attention from her and other Pelican Bay medical staff

between October 2015 and October 2016, but did not complain of any right leg issues during that

period. (Adam Declaration, ¶3.) For example, on October 5, 2015, Risenhoover reviewed

Morris's medications and adjusted his hypertension and seizure medications. (*Id.* at ¶4.) During

an October 16, 2015 appointment, Risenhoover met with Morris regarding the chronic care of his

seizure disorder and hypertension. (*Id.*) He reported that he exercised "five days per week,"

which included three or four laps in the yard and 1,000 pushups each day, and further stated that

he did not know why he had a notice regarding his mobility in his file because he felt "fine." (*Id.*)

On December 22, 2015, he was seen again by a nurse after complaining that his right foot

was swollen. (*Id.* at ¶6.) Defendant Risenhoover was consulted and stated that the blood test he

requested was not required. (*Id.*) At that time, Morris was receiving routine blood tests regularly

due to his other diagnoses. (*Id.*)

Morris was seen by Risenhoover on March 15, 2016 for the rash on his neck, and was

diagnosed with contact dermatitis. (*Id.* at ¶8.) He was told to rinse off the soap when he washed,

and to avoid scratching the area. (*Id.*) He was also seen by Risenhoover on August 25, 2016 for

his chronic care hypertension and seizure disorder. (*Id.* at ¶12.) During that appointment, Morris

reported that he was engaging in an exercise routine, and the notes concerning the appointment

10

1    indicated that he had good muscle development.  (*Id.*)

2         Morris submitted a request for care concerning his knee on October 23, 2016, and was seen

3    by a nurse the following day.  (*Id.* at ¶14.)  That appointment revealed that he had good

4    musculature in both legs, and full motion of the knee.  (*Id.*)  However, he did have some mild

5    swelling present in his right knee.  (*Id.*)  Nevertheless, Morris stated that he had no pain, and was

6    returned to his housing with no new orders.  (*Id.*)

7         **B.    Defendant Adam Was Not Deliberately Indifferent to Morris's Alleged**
         **Medical Needs.**

8

9         Defendant Adam also provided Morris with extensive medical attention during the relevant

10   period.  When Defendant Adam met with Morris on February 14, 2017 regarding his knee,

11   hypertension, and seizure disorder, he was given information regarding the avoidance of high

12   impact exercise, elevating his leg if it was swollen, and taking an occasional NSAID, such as

13   ibuprofen, if he was in pain.  (*Id.* at ¶15.)  Adam also told Morris, who reported that he was still

14   engaging in physical exercise, to put in another sick call request in two months if he did not feel

15   better.  (*Id.*)  At that time, physical therapy could be considered.  (*Id.*)

16        When Adam examined Morris on May 1, 2017, he complained of intermittent swelling of

17   his right knee with associated pain.  (*Id.* at ¶16.)  Adam ordered an x-ray, which was performed

18   on May 4, 2017 and revealed a small effusion, and moderate patellofemoral and medial

19   compartment osteoarthritis.  (*Id.*)  The effusion indicated that he had mild swelling and

20   inflammation of the knee, while osteoarthritis is a common type of "wear and tear" joint damage

21   that occurs with age and overuse or misuse.  (*Id.*)  Morris was provided with a letter informing

22   him of the x-ray results, and a follow-up appointment was scheduled with Adam.  (*Id.*)

23        Morris met with a nurse regarding his knee issues on May 22, 2017.  (*Id.* at ¶19.)  Although

24   there was swelling on the medial side of the knee, there was no clicking or popping in the knee.

25   (*Id.*)  Morris also had good muscle strength in his legs, was not limping, had no problem getting

26   on and off the exam table, and was able to do deep knee bends.  (*Id.*)  Defendant Adam examined

27   Morris in June 2017, and noted that he had full motion in the knee, and did not have any redness

28   or swelling.  (*Id.* at ¶20.)  Adam recommended that he engage in healthy knee exercises and

1    educated him regarding care when the knee is swollen.  (*Id*.)

2        Defendant Adam saw Morris on three occasions between August 2017 and February 2018.

3    (*Id*. at ¶22.)  During those appointments, Morris reported while he was continuing frequent

4    vigorous exercise, three to five times per week, he was avoiding high impact burpees.  (*Id*.)

5    Moreover, on April 26, 2018, she followed up with Morris regarding changes in his hypertension

6    medication and a rash.  (*Id*. at ¶24.)  She also met with Morris on June 25, 2018 regarding his

7    neck rash. (*Id*.)

8        Morris was seen by medical staff throughout the second half of 2018.  He was counseled

9    regarding lifestyle changes due to high cholesterol on July 11, 2018, and was seen for chronic

10   care hypertension and seizure disorder on July 24, 2018.  (*Id*. at ¶26.)  He met with a nurse in

11   August 2018 regarding pain in his pubic bone, which apparently began after he started engaging

12   in Navy seal workout.  (*Id*. at ¶27.)  Adam saw Morris on November 27, 2018 regarding an open

13   wound on his foot.  (*Id*. at ¶29.)  Due to the deep ulcers in the area, he was referred to general

14   surgery for debridement.  (*Id*.)  Defendant Adam also ordered further follow-up of his knee pain

15   and anterior hip pain.  (*Id*.)

16       The medical records indicate that Morris received frequent medical treatment from

17   Defendants and other medical staff during the relevant periods—October 2015 through October

18   2016, and May 2017 through November 2018.  Although he did not complain of right leg issues

19   to Risenhoover between October 2015 and October 2016, Morris was treated by Risenhoover for,

20   among other things, hypertension, seizure disorder, foot problems, and a neck rash during that

21   period.  (*Id*. at ¶¶3-14.)  In addition, Defendant Adam examined Morris frequently between May

22   2017 and November 2018.  During that period, she confirmed that although Morris had moderate

23   osteoarthritis, because he was very active and was able to engage in normal daily activities,

24   neither surgery nor a pre-surgical MRI was required.  In short, given the medical treatment that

25   Morris received from Defendants and other Pelican Bay medical staff between 2015 and 2018, his

26   Eighth Amendment deliberate indifference claim against Defendants must fail.

27   / / /

28   / / /

1    **II.    MORRIS LACKS EVIDENCE TO SUPPORT CLAIMS FOR PUNITIVE DAMAGES.**

2        Plaintiff prays for punitive damages against each Defendant.  (ECF No. 129 at 29.)  But

3    summary judgment should be granted against this claim for damages because, as the evidence

4    cited above shows, he lacks evidence that any Defendant acted with the "evil motive or intent" or

5    the "reckless or callous indifference to the federally protected rights of others," necessary to

6    justify his claim for punitive damages.  *Smith v. Wade*, 461 U.S. 30, 56 (1983).

7    **III.   DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY.**

8        Defendants were not deliberately indifferent to Morris's medical needs, nor could they have

9    recognized that providing him with extensive attention for both his osteoarthritis and other

10   medical issues violated the Constitution.  Therefore, as explained more fully below, Defendants

11   are entitled to qualified immunity.

12       **A.    The Qualified Immunity Standard.**

13       The defense of qualified immunity protects "government officials . . . from liability for civil

14   damages insofar as their conduct does not violate clearly established statutory or constitutional

15   rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800,

16   818 (1982).  Qualified immunity "provides ample protection to all but the plainly incompetent or

17   those who knowingly violate the law."  *Burns v. Reed*, 500 U.S. 478, 495 (1991) (citation

18   omitted).

19       The Supreme Court has recognized that qualified immunity "balances two important

20   interests—the need to hold public officials accountable when they exercise power irresponsibly

21   and the need to shield officials from harassment, distraction, and liability when they perform their

22   duties reasonably."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  Immunity "applies

23   regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a

24   mistake based on mixed questions of law and fact.'"  *Id.*

25       The *Pearson* decision held that a court may exercise its discretion in deciding how it will

26   address the two-part test from *Saucier v. Katz*, 533 U.S. 194 (2001), which examines (1) whether

27   there was a violation of a constitutional right and (2) if so, whether that right was "clearly

28   established" when the defendant acted.  *Id.* at 818.  The relevant, dispositive inquiry in

13

Defs.' Not. Mot. & Mot. Summ. J. (4:19-cv-02620-HSG (PR) )

1   determining whether a right is clearly established is whether it would be clear to a reasonable

2   officer that his conduct was unlawful in the situation he confronted.   *Saucier*, 533 U.S. at 201-02.

3       Moreover, it is not enough for a plaintiff to offer factually unsupported allegations.   "[T]o

4   prevail on the motion for summary judgment, a plaintiff must 'put forward specific,

5   nonconclusory factual allegations' that establish improper motive causing cognizable injury."

6   *Jeffers v. Gomez*, 267 F.3d 895, 907 (9th Cir. 2001) (citations omitted).

7       **B.**    **Defendants Are Entitled to Qualified Immunity Because They Did Not**

8           **Violate Morris's Eighth Amendment Rights.**

9       As mentioned, *Pearson* provides lower courts with discretion to decide which of the two

10   prongs of the qualified immunity analysis should be addressed first in light of the circumstances

11   in the particular case at hand.   555 U.S. at 235-37.   However, *Pearson* also recognized that the

12   *Saucier* protocol is often beneficial.   *Id.*   In this case, regardless of which prong this Court

13   chooses to address first, Defendants are entitled to qualified immunity and summary judgment.

14       The first step under *Saucier* is to determine whether, taken in the light most favorable to the

15   party asserting the claim, the facts alleged show that the government official's conduct violated a

16   constitutional right.   533 U.S. at 201.   Defendants do not dispute that prisoners have certain rights

17   under the Eighth Amendment.   As discussed above, however, Morris has failed to show how

18   those constitutional rights were violated by Defendants in this action.   Under *Saucier*, this Court's

19   inquiry should end here.   *Id.*   Therefore, Defendants respectfully request that this Court find that

20   they are protected by the doctrine of qualified immunity.

21       **C.**    **Defendants Are Also Entitled to Qualified Immunity Because It Would Not**

22           **Have Been Clear to a Reasonable Prison Official That Their Conduct Was**
        **Unlawful.**

23       Even if this Court were to weigh judicial precedent and come to the conclusion that, in

24   retrospect, Defendants' actions were unconstitutional, it would not have been clear to a

25   reasonable prison official in the circumstances that such conduct was unlawful.   In determining

26   whether Defendants violated clearly established law, the key question is whether the state of the

27   law provided "fair warning" that their conduct was unconstitutional.   *Hope v. Pelzer*, 536 U.S.

28   730, 740 (2002).   The analysis must focus on "what [she] reasonably understood [her] powers and

14

1  responsibilities to be, when [she] acted, under clearly established standards." *Saucier*, 533 U.S. at

2  208.

3      In this case, it would not have been evident to a reasonable prison official that a court could

4  somehow find that a violation of the Eighth Amendment occurred when Defendant Risenhoover

5  provided extensive medical care for among other things, hypertension, seizure disorder, foot

6  problems, and a neck rash, and Defendant Adam provided care for Morris's osteoarthritis.

7  Accordingly, Defendants are entitled to qualified immunity because it would not have been clear

8  to a reasonable prison official that their conduct was unlawful.

9  **CONCLUSION**

10      For the foregoing reasons, Defendants' motion for summary judgment and qualified

11  immunity should be granted.

12

13  Dated:  October 27, 2020              Respectfully Submitted,

14                          XAVIER BECERRA

15                          Attorney General of California
                        JAY M. GOLDMAN

16                          Supervising Deputy Attorney General

17

18                          */s/ Michael J. Quinn*

19                          MICHAEL J. QUINN
                        Deputy Attorney General

20                          *Attorneys for Defendants Risenhoover and Adam*

21  SF2020200050
42402725.docx

22

23

24

25

26

27

28

15

# CERTIFICATE OF SERVICE

Case Name:  **T. Morris (J62077) v. State of**        No.  **4:19-cv-02620-HSG (PR)**
**California, et al.**

I hereby certify that on <u>October 27, 2020</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR
SUMMARY JUDGMENT**

**DEFENDANTS' RAND WARNING TO PLAINTIFF REGARDING
OPPOSING SUMMARY JUDGMENT**

**DECLARATION OF DEFENDANT DR. ADAM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

**[PROPOSED] ORDER GRANTING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar at which member's direction this service is made. I am 18 years of age or older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service with postage thereon fully prepaid that same day in the ordinary course of business.

I further certify that some of the participants in the case are not registered CM/ECF users. On <u>October 27, 2020</u>, I have caused to be mailed in the Office of the Attorney General's internal mail system, the foregoing document(s) by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within three (3) calendar days to the following non-CM/ECF participants:

**Tairay Taqwain Morris, J62077**
Pelican Bay State Prison
P.O. Box 7000
Crescent City, CA  95531-7000
*In Pro Per*

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>October 27, 2020</u>, at San Francisco, California.

| | |
|---|---|
| R. Caoile | **/s/ R. Caoile** |
| Declarant | Signature |

SF2020200050
42403135.docx