UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TAIRAY TAQWAIN MORRIS,<br>Plaintiff,<br>v.<br>NANCY ADAMS, et al.,<br>Defendants. | Case No. 19-cv-02620-HSG<br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br>Re: Dkt. No. 40 |

Plaintiff filed this *pro se* civil rights action under 42 U.S.C. § 1983 alleging that Pelican Bay State Prison ("PBSP") nurse Risenhoover and doctor Adam were deliberately indifferent to his serious medical needs, in violation of the Eighth Amendment. Defendants have filed a summary judgment motion. Dkt. No. 40. Plaintiff has filed an opposition, and Defendants have filed a reply. Dkt. Nos. 43, 44. For the reasons set forth below, the Court GRANTS Defendants' summary judgment motion.

**FACTUAL BACKGROUND**

**I.    Defendant Risenhoover (Medical Treatment from October 2015 – October 2016)**

Plaintiff alleges that between October 15, 2015 and October 22, 2016, he complained to defendant Risenhoover about pain in his right knee, but she completely failed to provide treatment. Dkt. No. 29 ("Am. Compl.") at 5; Dkt. No. 43-1 at 4. Plaintiff does not provide any specifics regarding this allegation.

In response, defendant Risenhoover contends that between October 2015 and October 2016, Plaintiff received "extensive" medical attention, and that Plaintiff did not inform defendant Risenhoover of any issues with his right leg. Defendant Adams details the following medical treatment that Defendants and other prison officials provided to Plaintiff between October 1, 2015

1 and October 22, 2016.

2 On October 1, 2015, defendant Risenhoover sent Plaintiff a notification letter regarding lab results and indicated that the results would be discussed with him at his next regularly scheduled chronic case visit. Adam Decl. ¶ 4.

On October 5, 2015, defendant Risenhoover reviewed Plaintiff's medications and adjusted his hypertension and seizure medications. Adam Decl. ¶ 4.

On October 13, 2015, Plaintiff was seen by a nurse for cold symptoms. Adam Decl. ¶ 4.

On October 16, 2015, Plaintiff had a chronic care visit with defendant Risenhoover for his seizure disorder and hypertension. During this appointment, Plaintiff reported that he exercised "five days per week," which included three or four laps in the yard and 1,000 pushups each day. Plaintiff also referenced the CDCR-7410 form/notice in his file which required that he be housed in a low bunk and low tier due to his seizure disorder and the consequent danger of falls. Plaintiff stated that he did not know why he had this notice because he felt "fine." Adam Decl. ¶ 4.

On November 24, 2015, Plaintiff was seen by a nurse and requested "some kind of cream to make the calluses between [his] toes go away." Adam Decl. ¶ 5. The nurse found that Plaintiff had dry, cracked skin between his toes, and instructed Plaintiff to keep his feet clean and dry. Adam Decl. ¶ 5.

On December 22, 2015, Plaintiff was seen by a nurse after complaining that his right foot was swollen. Adam Decl. ¶ 6. Plaintiff refused to walk to the clinic and was examined in the housing unit rotunda with his permission. Plaintiff reported that his foot was swollen and painful but that he was continuing his exercise routine. Plaintiff refused antifungal cream and requested a blood test. Defendant Risenhoover was consulted and she denied the request, stating that the blood test sought was not required. Plaintiff regularly received other routine blood tests due to his other health conditions. Plaintiff was observed walking back to his cell with a normal gait. Adam Decl. ¶ 6.

On February 2, 2016, Plaintiff was seen by a nurse for a rash on his neck and was given hydrocortisone cream. Adam Decl. ¶ 7.

On March 1, 2016, Plaintiff had a chronic care visit for his hypertension and seizure

disorder. He reported that he still exercised five days per week, but had quit doing burpees. The notes from that visit did not refer to any leg swelling. Adam Decl. ¶ 8.

On March 9, 2016, Plaintiff complained that his rash had spread to both sides of his neck and that the hydrocortisone cream prescribed was ineffective. Adam Decl. ¶ 8.

On March 15, 2016, Plaintiff was seen by defendant Risenhoover about his neck rash and diagnosed with contact dermatitis. Defendant Risenhoover instructed him to rinse soap off after washing, and to avoid scratching the affected area. Adam Decl. ¶ 9.

On March 23, 2016, Plaintiff was seen by a nurse for the ongoing neck rash. Adam Decl. ¶ 9.

On March 24, 2016, Plaintiff had an annual EKG screening, which was normal. Plaintiff also had labs drawn for cholesterol and thyroid, and these labs also came back normal. Adam Decl. ¶ 9.

In April 2016, Plaintiff had labs drawn for a comprehensive metabolic panel and urinalysis, and these labs came back normal. Adam Decl. ¶ 10.

On April 20, 2016, Plaintiff was seen by a nurse and given another bottle of ointment for his neck rash. Adam Decl. ¶ 10.

In August 2016, labs were drawn to measure Plaintiff's carbamazepine level, to get a complete blood count, and for a urinalysis. These labs came back normal. Adam Decl. ¶ 11.

On August 25, 2016, Plaintiff had a chronic care visit with defendant Risenhoover for his hypertension and seizure disorder. Plaintiff reported that he was still engaging in the same exercise routine and avoiding burpees. The notes from this appointment indicated that Plaintiff had good muscle development. Adam Decl. ¶ 12.

On September 1, 2016, labs were again drawn for Plaintiff's complete blood count and carbamazepine level, and they came back normal. Adam Decl. ¶ 13.

On October 23, 2016, Plaintiff submitted another request for care, stating that his knee was swelling when he ran. Adam Decl. ¶ 14.

On October 24, 2016, Plaintiff was seen by a nurse in response to this request. The appointment notes reported that he had good musculature in both legs and full motion of the knee,

3

but did have some mild swelling present in his right knee. The appointment notes reported that Plaintiff stated that he had no pain. Plaintiff was returned to his housing with no new orders. Adam Decl. ¶ 14.

**II.	Defendant Adam (Medical Treatment from May 2017 – November 2018)**

Plaintiff alleges that between May 2017 and November 2018, he complained to defendant Adam about pain in his right knee, but she completely failed to provide treatment. Plaintiff does not provide any specifics regarding this allegation.

In response, defendant Adam contends that Plaintiff received extensive medical attention, and that between May 2017 and November 2018 Plaintiff had moderate osteoarthritis that did not require either surgery or a pre-surgical MRI, because Plaintiff was very active and was able to engage in normal daily activities. Adam Decl. ¶ 30.

Defendant Adam details the following medical care for Plaintiff between February 2017, when defendant Adam first started addressing the right knee issue, and November 2018.

On February 8, 2017, Plaintiff was seen by a nurse for right knee pain and a follow-up visit with defendant Adam was scheduled for February 14, 2017. Adam Decl. ¶ 15.

On February 14, 2017, Plaintiff met with defendant Adam regarding his knee, and also received routine care for his hypertension and seizure disorder. Plaintiff informed defendant Adam that he believed that his knee had been injured in a fight two years ago and that the injury had been exacerbated since then by playing basketball. Defendant Adam examined Plaintiff's right knee and found it to be "normal." Plaintiff informed defendant Adam that he exercised five days per week for about ninety minutes per session, which included twenty laps around the yard over a thirty-minute period. Defendant Adam counseled Plaintiff to avoid high impact exercise, elevate the leg if swollen, and take an occasional non-steroidal anti-inflammatory (NSAID), such as ibuprofen, if the knee was painful. Defendant Adam instructed Plaintiff to put in another sick call request if he did not feel better within two months because physical therapy could be considered at that time. Adam Decl. ¶ 15.

On March 16, 2017, Plaintiff was seen by a nurse in response to a complaint of knee swelling. Plaintiff told the nurse that he was following defendant Adam's instructions from his

4

last visit. Defendant Adam asked the nurse to tell him to continue the plan for another month, as previously instructed. Adam Decl. ¶ 16.

In April 2017, Plaintiff was seen by nurses twice, the first time for a cold and the second time for his knee. The nurse reported a near normal exam of the knee, based on Plaintiff's ability to do deep knee bends, even though he needed to hold onto the table to rise back up to a standing posture. Adam Decl. ¶ 16.

On May 1, 2017, Plaintiff had a follow-up appointment with defendant Adam. In response to Plaintiff's complaint of intermittent swelling of his right knee with associated pain, defendant Adam ordered a knee x-ray of Plaintiff's right knee. The knee x-ray, performed on May 4, 2017, showed a small effusion and moderate patellofemoral and medial compartment osteoarthritis.

Defendant Adam explains the x-ray results as follows. The effusion indicated that Plaintiff had mild swelling and inflammation of the knee. Osteoarthritis is a common type of "wear and tear" joint damage that occurs with age. Overuse or misuse would not be an uncommon finding in a 40-year-old man such as Plaintiff, who had engaged in years of repetitive high impact exercise during incarceration. Adam Decl. ¶ 16. Moderate osteoarthritis is usually treated conservatively with appropriate exercise, i.e. decreasing high impact exercise while maintaining strength exercises; weight loss; and possibly NSAIDs. The extent of intervention prescribed is based on the patient's disability. Plaintiff would be considered to have a high level of functioning with the osteoarthritis because he reported regularly engaging in a vigorous exercise routine, including running. Adam Decl. ¶ 17.

A letter was written to Plaintiff to inform him of the x-ray results, and a follow up appointment with defendant Adam was scheduled. Adam Decl. ¶ 16.

On May 22, 2017, Plaintiff was seen by a nurse concerning the x-ray results and in response to his complaints of knee pain and intermittent swelling. Adam Decl. ¶ 19. The nurse explained to Plaintiff that he had arthritis and educated him regarding that condition. The nurse noted swelling on the medial side of the knee, but noted no clicking or popping in the knee. The nurse also noted that Plaintiff had good muscle strength in his legs, was not limping, had no problem getting on and off the exam table, and was able to do deep knee bends. Adam Decl. ¶19.

On June 6, 2017, defendant Adam met with Plaintiff to review the x-ray results and examine his knee. Adam Decl. ¶ 20. Plaintiff had previously declined physical therapy, and defendant Adam informed him that an MRI was not required. According to defendant Adam, although Plaintiff's knee had mild crepitus, a typical symptom of osteoarthritis, Plaintiff had full motion and his knee did not have any redness or swelling. Defendant Adam recommended that Plaintiff engage in healthy knee exercises, and instructed Plaintiff how to care for his knee when it was swollen. Adam Decl. ¶ 20.

On August 7, 2017, November 1, 2017 and February 1, 2018, defendant Adam saw Plaintiff for routine care of his hypertension and seizure disorder. During these visits, Plaintiff reported that he was continuing to engage in frequent vigorous exercise, three to five times per week, but avoiding high impact burpees. Adam Decl. ¶ 22.

On April 16, 2018, Plaintiff was seen by a nurse in response to his complaint of an ongoing rash on his neck. He requested an ointment refill, but the refill had already been requested from the pharmacy. Adam Decl. ¶ 23.

On April 26, 2018, Plaintiff had a follow-up appointment with defendant Adam regarding his hypertension medicine changes and his rash. Plaintiff reported that his blood pressure was high that morning because he had just finished exercising. Adam Decl. ¶ 24.

On July 11, 2018, Plaintiff was notified of lab results showing that he had high cholesterol, and was counseled regarding lifestyle changes.

On July 24, 2018, Plaintiff was seen for chronic care of his hypertension and seizure disorder. An EKG was done and his medications were adjusted. During his appointment, he stated that he was exercising three to four times per week, for two hours per session. Adam Decl. ¶ 26.

On August 1, 2018, Plaintiff was seen by a nurse for pain in his pubic bone. Plaintiff told the nurse that the discomfort began after he started doing a new Navy seal workout, and that the pain recently occurred when he ran and did squats. Adam Dec. ¶ 27.

On November 21, 2018, Plaintiff was seen by a nurse because a routine blood pressure check showed an elevated blood pressure. Adam Decl. ¶ 28.

On November 26, 2018, Plaintiff was seen by a nurse in response to a complaint of toe pain from a "cut on toe" that hurt every time he showered and to a separate request for care due to knee pain. The nurse was very concerned about the condition of Plaintiff's toes and ordered an urgent follow up by a primary care physician. Defendant Adam saw Plaintiff the next day, on November 27, 2018, and examined an open wound on Plaintiff's foot. Defendant Adam observed deep ulcers in that area and referred Plaintiff to general surgery for debridement. Defendant Adam also ordered further follow-up as to Plaintiff's knee pain and anterior hip pain. At that time, Plaintiff told defendant Adam that he had cut back on running during the previous year, but that his knee pain had returned two months earlier after running ten laps in "too flat" shoes. Adam Decl. ¶¶ 28-29.

# DISCUSSION

## I. Summary Judgment Standard

Summary judgment is proper where the pleadings, discovery and affidavits show there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a) (2014). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See id.*

A court shall grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial [,] . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party to "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file, 'designate 'specific facts showing that there is a genuine issue for trial.'" *See id.* at 324 (citing Fed. R. Civ. P. 56(e)).

For purposes of summary judgment, the court must view the evidence in the light most favorable to the nonmoving party; if the evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the court must assume the truth of the evidence submitted by the nonmoving party. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999). The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv., Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

## II. Deliberate Indifference to Serious Medical Needs

A prison official's deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled in part on other grounds by WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997). A determination of "deliberate indifference" involves an examination of two elements: the seriousness of the prisoner's medical need and the nature of the defendant's response to that need. *See McGuckin*, 974 F.2d at 1059. A "serious" medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." *McGuckin*, 974 F.2d at 1059 (citing *Estelle*, 429 U.S. at 104). The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a serious need for medical treatment. *Id.* at 1059-60 (citing *Wood v. Housewright*, 900 F.2d 1332, 1337-41 (9th Cir. 1990)). A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but he "must also draw the inference." *Id*. If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk. *Gibson*, 290 F.3d at 1188. In order for deliberate indifference to be

8

1 established, therefore, there must be a purposeful act or failure to act on the part of the defendant and resulting harm. *See McGuckin*, 974 F.2d at 1060.

**III. Analysis**

**A.  RN Risenhoover (October 15, 2015 to October 22, 2016)**

Defendant Risenhoover argues that she is entitled to summary judgment because she provided Plaintiff with extensive medical attention during the relevant time period and because Plaintiff never complained of any right leg issues during that period. Defendants have presented evidence that between October 15, 2015 and October 22, 2016, Plaintiff did not inform defendant Risenhoover of any concerns regarding swelling in his right knee, and that to the extent that she was informed of any other medical concerns Plaintiff had during that time period, she provided reasonably appropriate medical care. According to defendant Adam's summary of Plaintiff's medical care, between October 15, 2015 and October 22, 2016, Plaintiff was seen at least thirteen times, either for regular care for his ongoing hypertension and seizure disorder or in response to his requests for medical care. During that time period, Plaintiff had blood tests and labs done to monitor his health, as well as an EKG screening. Nothing in the record indicates that Plaintiff reported pain in his right knee during any of these thirteen visits. Plaintiff reported engaging in a vigorous exercise routine at least five days a week. The exercise routine consisted of three or four laps in the yard and 1,000 pushups, though Plaintiff reported avoiding burpees starting in August 2016. Only five of these thirteen visits involved interaction with defendant Risenhoover. Three of these visits were chronic care follow-up visits with defendant Risenhoover. Another visit was the December 22, 2015 exam to address Plaintiff's complaint that his right foot was swollen and painful, and involved defendant Risenhoover denying Plaintiff's request for a blood test as not required. The other visit was the March 15, 2016 exam in response to Plaintiff's complaint that his neck rash had spread to both sides of his neck and that the hydrocortisone cream did not work. Defendant Risenhoover diagnosed him with contact dermatitis, and instructed him to rinse off soap after washing and avoid scratching the affected area.

Plaintiff does not directly dispute the above description of his medical care between October 15, 2015 and October 22, 2016. He simply repeats the same conclusory statement made

9

in his amended complaint: "I made several request to defendant Risenhoover from October 16, 2015 to October 22, 2016 complaint about the swelling in my right leg, but Risenhoover did not treat my injuries which result[ed] in further serious injuries." Dkt. No. 43-1 at 1 (emphasis in original). Plaintiff provides no details to support this allegation and does not address the medical treatment that was provided to him during the relevant time period.

Plaintiff was clearly instructed and cautioned as to the burden of proof necessary to oppose a motion for summary judgment in both the Court's November 26, 2019 order screening the complaint, and in the October 27, 2020 *Rand* warning provided by Defendants. Specifically, Plaintiff was told:

> When a party you are suing makes a motion for summary judgment that is properly supported by declarations (or other sworn testimony), you cannot simply rely on what your complaint says. Instead, you must set out specific facts in declarations, depositions, answers to interrogatories, or authenticated documents, as provided in Rule 56(c), that contradict the facts shown in the defendants' declarations and documents and show that there is a genuine issue of material fact for trial. If you do not submit your own evidence in opposition, summary judgment, if appropriate, may be entered against you. If summary judgment is granted, your case will be dismissed and there will be no trial.

Dkt. No. 16 at 11-12; Dkt. No. 40-1 at 2.

Despite these instructions, Plaintiff has not pointed to any specific facts that show that there is a genuine issue as to whether defendant Risenhoover was aware of a serious medical need with respect to the swelling in his right knee. Plaintiff has not pointed to specific facts or evidence in the record that contradict defendant Adam's detailed account of Plaintiff's medical treatment during the relevant time period, including the allegation that the medical records show no indication that Plaintiff complained of pain in his right leg until after the relevant time period, other than the December 22, 2015 complaint about a swollen right foot. The only treatment denied with respect to Plaintiff's right leg was the denial of the blood test requested during the December 22, 2015 appointment regarding his swollen right foot. However, Plaintiff has not explained how denial of this blood test disregarded serious risk of substantial harm to his right leg. Although the Court may not engage in credibility determinations or a weighing of the evidence, "[a] conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact." *F.T.C. v. Publ'g Clearing House, Inc.*, 104

1  F.3d 1168, 1171 (9th Cir. 1997)).

2  Accordingly, the Court GRANTS summary judgment in favor of defendant Risenhoover. *See, e.g., Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (finding that prisoner failed to demonstrate that there were any genuine issues of material fact in dispute when she did not submit any documents opposing summary judgment other than the pleadings).

**B.     Dr. Adam (May 8, 2017 through November 26, 2018)**

Defendant Adam argues that she is entitled to summary judgment because she provided Plaintiff with extensive medical attention during the relevant time period and that, given that Plaintiff was very active and able to engage in normal daily activities during the relevant time period, his moderate osteoarthritis did not require either a presurgical MRI or surgery. Defendants have presented evidence that between May 8, 2017 and November 26, 2018, defendant Adam examined Plaintiff in response to his complaints of right knee pain and determined that a pre-surgical MRI and surgery were not necessary because Plaintiff was very active and able to engage in normal daily activities. According to the record, between May 8, 2017 and November 26, 2018, Plaintiff was seen approximately fourteen times by medical staff and the following actions were taken with respect to his complaint of swelling in the right knee and associated pain: on May 1, 2017, an x-ray was ordered; on May 4, 2017, an x-ray was taken which showed moderate osteoarthritis; on May 22, 2017, he was examined by a nurse; on June 6, 2017, he was examined by defendant Adam who informed him that an MRI was not required for his knee and recommended that he engage in health knee exercises; and on November 27, 2018, he was again examined by defendant Adam. In Plaintiff's medical appointments during this time period, Plaintiff reported exercising three to five times a week, and that his exercise routine included running and squats. Physical examinations indicated that Plaintiff had good muscle strength in his legs, was not limping, had no trouble getting on and off the exam table, and was able to do deep knee bends. Although Plaintiff had redness and swelling in the knee at the May 22, 2017 visit, the knee was no longer swollen by the June 6, 2017 visit.

Plaintiff does not directly dispute the above description of his medical care between May 8, 2017 and November 26, 2018. He simply repeats the same conclusory statement made in his

11

amended complaint: "I made numerous sick call request from May 8th, 2017 to November 26, 2018 regarding my knee osteoarthritis but defendant Adams (sic) failed to treat my serious medical condition which results in further degradation of my serious medical condition, contrary to defendant Dr. Adam's declaration dated October 23, 2020." Dkt. No. 43-1 at 1 (emphasis in original). Plaintiff provides no details to support this allegation and does not address the medical treatment that was provided to him during the relevant time period.

As discussed above, although the Court may not engage in credibility determinations or a weighing of the evidence, a conclusory, self-serving statement that lacks detailed facts and any supporting evidence is insufficient to create a genuine issue of material fact. *F.T.C.*, 104 F.3d at 1171. Plaintiff has not pointed to any specific facts in the record that raise a triable issue as to whether defendant Adam's course of treatment violated the Eighth Amendment, and has only made a conclusory statement in opposition to defendant Adam's description of the medical care provided. "A difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983 claim." *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981). In order to prevail on a claim involving choices between alternative courses of treatment, a plaintiff must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that he or she chose this course in conscious disregard of an excessive risk to plaintiff's health. *Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004); *see also Floyd v. Dang*, 577 F. App'x 696, 697 (9th Cir. 2014) (affirming summary judgment for doctors on claim that they failed to test for hepatitis C because, although plaintiff had several risk factors for hepatitis C, he presented no evidence "that shows what level of risk that a prisoner is infected with [h]epatitis C would be medically unacceptable to ignore" and therefore did not present evidence that would allow jury to find that choice made was medically unacceptable under circumstances). Accordingly, the Court GRANTS summary judgment in favor of defendant Adam.

**IV.     Qualified Immunity and Punitive Damages**

Because the Court has granted summary judgment in favor of Defendants, the Court declines to address Defendants' arguments regarding qualified immunity and punitive damages.

12

**CONCLUSION**

For the reasons set forth above, the Court GRANTS Defendants' motion for summary judgment. The Clerk shall enter judgment in favor of Defendants and against Plaintiff, and close the case.

**IT IS SO ORDERED.**

Dated: 5/26/2021

HAYWOOD S. GILLIAM, JR.
United States District Judge